FILED

MAY 2 6 2006

CLERK
United States Bankruptcy Court
San Jose, California

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

<table>
<tr><td>In re</td><td>]</td><td>Case No. 04-54151 ASW</td></tr>
<tr><td></td><td>]</td><td></td></tr>
<tr><td>PAUL B. BURTON,</td><td>]</td><td>Chapter 13</td></tr>
<tr><td></td><td>]</td><td></td></tr>
<tr><td>Debtor.</td><td>]</td><td></td></tr>
<tr><td></td><td>]</td><td></td></tr>
<tr><td></td><td>]</td><td></td></tr>
</table>

MEMORANDUM DECISION
SUSTAINING DEBTOR'S OBJECTION
TO CLAIM OF LAURA AUGUSTA

Before the Court, in the above-captioned chapter 13[1] case, is Paul B. Burton's ("Debtor") objection to the filed claim of Laura Augusta ("Creditor").

This matter was briefed and an evidentiary hearing was conducted on December 5, 2005. At the close of the evidentiary hearing the Court requested that the parties submit post-hearing briefs and on December 16, 2005, this Court entered its *Order*

---

[1] Unless otherwise noted, all statutory references are to Title 11, United States Code (the Bankruptcy Code), as it existed when Debtor filed his bankruptcy case.

1   *Regarding Issue of Statute of Limitations*, requiring the parties to

2   brief the issue of whether an applicable statute of limitations

3   limits the Debtor's liability, if any, with regard to the debt

4   associated with certain of Creditor's credit cards. The parties

5   filed their post-hearing briefs on or about January 6, 2006.

6     The only witnesses called during the evidentiary hearing were

7   Debtor and Creditor. Debtor is represented by Judson T. Farley,

8   Esq.; Creditor is represented by Alan J. Sternberg of the Law

9   Offices of Alan J. Sternberg.

10   At the time of the evidentiary hearing, the only issue for this

11   Court to determine was whether Debtor was responsible for

12   indemnifying Creditor for three outstanding credit card bills --

13   Chase, Bank of America and Exxon -- totaling, on June 1, 2001,

14   $11,228.94, which Creditor asserted Debtor had assumed pursuant to

15   the agreement for the sale and purchase of Creditor's floral

16   business called L'Daisy Patch ("L'Daisy").[2]

17   During the evidentiary hearing, both parties stipulated to a

18   judgment stating that, to the extent Creditor is legally required

19   to pay Michael Cochrane ("Cochrane") or Midwest of Canon Falls

20   ("Midwest") for the debts associated with L'Daisy, Debtor must

21   indemnify and reimburse Creditor per the terms of the Indemnity and

22   Hold Harmless Agreement ("Indemnity Agreement").

23   This Memorandum Decision constitutes the Court's findings of

24   fact and conclusions of law, pursuant to Rule 7052 of the Federal

25   Rules of Bankruptcy Procedure.

26

27 ─────────────

28     [2] At the time of the evidentiary hearing, L'Daisy was no longer an operating business. Debtor closed the business at the end of 2002.

MEMORANDUM DECISION SUSTAINING DEBTOR'S
OBJECTION TO CLAIM OF LAURA AUGUSTA     2

## STATEMENT OF FACTS

On July 1, 2004, Debtor filed a voluntary petition under chapter 13 of the United States Bankruptcy Code. On October 25, 2004, Creditor filed a proof of claim against Debtor's estate asserting that Debtor owed her $189,203.26 associated with Debtor's purchase of L'Daisy from Creditor ("Claim"). On November 8, 2004, Debtor filed an *Objection to Claim of Laura Augusta and Notice Thereof*, objecting to the entirety of Creditor's Claim. The parties essentially resolved their dispute with regard to everything except the debt associated with three credit cards -- Chase, Bank of America and Exxon.

In June 2001, Debtor and Creditor commenced negotiations for Creditor to sell, and Debtor to purchase, L'Daisy. At the time of the negotiations, L'Daisy had been operating for approximately 20 years and was losing money. The parties agreed that in exchange for the business, Debtor would assume responsibility for some, if not all, of L'Daisy's business debts. Approximately half of the total debt that Debtor was to assume consisted of general business debts and the remaining debt consisted of a business loan from Cochrane. The transaction between the parties did not result in Debtor paying any money to Creditor.

The agreement between the parties was evidenced by: (1) Bill of Sale; (2) Non-Negotiable Promissory Note (installment) ("Promissory Note"); (3) Indemnity Agreement; (4) Buyer's Closing Statement and Closing Escrow Instructions ("Closing Statement"); (5) Allocation of Purchase Price; and (6) Exhibit A (collectively, (1) - (6) may hereinafter be referred to as the "Escrow Documents").

**A.) Creditor's Testimony**

Creditor asserted that when the parties began their negotiations, she was initially going to remain a part owner of L'Daisy, however, as negotiations progressed, her role within L'Daisy was reduced to managing the business and then Debtor advised her that her services would not be necessary. Creditor asserted that the negotiations were extremely stressful and caused her to suffer psychologically and, as a result, Creditor gave possession of L'Daisy to Debtor in June 2001 and then left San Jose.

Prior to giving Debtor possession of L'Daisy and leaving San Jose, Creditor and Debtor's bookkeeper -- Sharis -- reviewed L'Daisy's books and records to create a list of L'Daisy's vendors that needed to be paid. This list, dated June 6, 2001, was entitled *L'Daisy Patch Vendor Balance Detail* ("Vendor Balance Sheet")[3]. Sharis then presented the Vendor Balance Sheet to Debtor and she and Debtor discussed the Vendor Balance Sheet and identified the vendors that had to be immediately paid to keep the business operating. Debtor testified that prioritizing the debts contained in the Vendor Balance Sheet was important because he wanted to make sure that none of L'Daisy's business debts were sent to a collection agency because it would cause problems for Creditor. The Vendor Balance Sheet reflected total general business debts of $85,478.32 and included three credit card debts -- Chase, Bank of America and Exxon -- with a combined balance of

---

[3] The Vendor Balance Sheet was admitted into evidence as **Exhibit 1**.

$11,228.94. Creditor testified that the Vendor Balance Sheet contained the debts that Debtor promised Creditor he would pay to purchase Creditor's business. Creditor asserted that she assumed the Vendor Balance Sheet would be included in the Escrow Documents. Creditor testified that the three credit cards were in her name and not L'Daisy's name, but that the cards were used solely for business purposes.

Creditor explained that after she left town, she and Debtor did not have any further communication with each other. Creditor stated that she was unaware that any further negotiations were necessary with regard to L'Daisy's business debt because she believed that the parties had agreed that Debtor would assume the debts identified in the Vendor Balance Sheet. When the transaction was finally closing, Creditor did not return to San Jose to execute the Escrow Documents; instead, Creditor signed the Escrow Documents and sent them back to the escrow company via facsimile. Creditor testified that the escrow company sent her the Escrow Documents, except for Exhibit A. No representative from the escrow company testified during the evidentiary hearing.

Creditor testified that she reviewed the Closing Statement and saw that Debtor was assuming $98,847.17 of L'Daisy's general business debt and noted that this figure was higher than the $85,478.32 identified in the Vendor Balance Sheet. Creditor further testified that she did not investigate or consult anyone about Exhibit A when she saw it referenced in the Escrow Documents. Creditor assumed that the $98,847.17 figure included all the debts identified in the Vendor Balance Sheet plus additional items. Creditor testified that she signed the Escrow Documents without

1  inquiring into or confirming if Exhibit A included the three credit

2  card debts.  In support of Creditor's assumption that Exhibit A

3  contained the three credit card debts, Creditor cited to an email

4  that she received, on or about February 20, 2002 -- approximately

5  eight days prior to the close of escrow -- from Carla Griffith

6  ("Griffith"), the escrow agent, specifically stating that the

7  Chase, Bank of America and Exxon credit card balances remained

8  unpaid.  The email did not mention, anywhere in its text, that

9  Debtor had assumed these obligations.

10       Creditor testified that she was unaware that the three credit

11 cards had not been paid in full until, in or about September 2003,

12 she was denied a small business loan because she had a poor credit

13 rating.  Creditor explained that she immediately obtained and

14 reviewed her credit report[4] and found that the Chase, Bank of

15 America and Exxon credit card debts had not been paid.  The credit

16 report identified twelve separate individual credit lines, with

17 only two of those credit lines reflecting a "never late" status.

18 The Chase, Bank of America and Exxon credit cards had a status of

19 "Account Charged Off."  The remaining seven credit lines reflected

20 that they were or had been past due, were paid in settlement or

21 were in collections.  The credit report reflected that the Chase,

22 Bank of America and Exxon credit cards had the following balances:

23 (1) $2,422; (2) $6,460; and (3) $4,420, respectively.  Creditor

24 explained that she settled the outstanding balance on the Chase

25 credit card for $667.  Despite believing that Debtor promised to

26 pay the Chase, Bank of America and Exxon credit card debts as part

27

28       [4] Creditor's September 2003 credit report was admitted into evidence as **Exhibit 9.**

MEMORANDUM DECISION SUSTAINING DEBTOR'S
OBJECTION TO CLAIM OF LAURA AUGUSTA                    6

1    of the sale and purchase of L'Daisy, Creditor testified that she

2    did not attempt to contact Debtor to investigate why Debtor had

3    failed to pay these debts in full.

4         Creditor testified that, at the time of evidentiary hearing,

5    she was unable to obtain a current credit report so that she could

6    identify the interest and late fees that had accrued on the Bank of

7    America and Exxon credit card debts because she did not have any

8    credit activity in the last several years.  In addition, Creditor

9    testified that obtaining the balance on the Bank of America and

10   Exxon cards was impossible because the debts had been transferred,

11   possibly several times, to different companies and she did not know

12   the identities of the new companies.  Creditor asserted that due to

13   Debtor's failure to pay the three credit card balances, which

14   Creditor maintained Debtor promised to do, she continues to receive

15   constant telephone calls from collection agencies.  Creditor

16   explained that she does not know who these agencies are because she

17   either hangs up the telephone or deletes her answering machine

18   messages without listening to them.

19   **B.)  Debtor's Testimony**

20        Debtor testified that in early June 2001, he began negotiating

21   with Creditor to purchase L'Daisy.  Debtor confirmed that his

22   bookkeeper and Creditor created the Vendor Balance Sheet, but

23   disputed that it represented anything more than the initial list of

24   L'Daisy's business debts.  Instead, Debtor testified that the

25   Vendor Balance Sheet was just a starting point from which the

26   parties would further negotiate.  Debtor explained that in the

27   midst of the negotiations, in June 2001, Creditor left town due to

28   her "mental state."  According to Debtor, Creditor's departure

MEMORANDUM DECISION SUSTAINING DEBTOR'S
OBJECTION TO CLAIM OF LAURA AUGUSTA                          7

1  occurred prior to the parties reaching an agreement with regard to

2  the business debt that Debtor was going to assume.  Upon Creditor's

3  departure, Debtor took possession of L'Daisy and continued to

4  operate the business as a going concern.  Debtor testified that

5  from June 2001, until the transaction closed in February 2002, he

6  was trying to get a handle on L'Daisy's business debts because

7  debts continued to filter into the business.  Debtor explained that

8  due to Creditor's absence, he continued negotiating the terms of

9  the sale and purchase with Cochrane and Griffin.  Debtor stated

10  that he, Cochrane and Griffin had several meetings to narrow down

11  the business debts that Debtor was willing to assume.  Debtor

12  testified that, with the assistance of Cochrane and Griffin, he

13  created Exhibit A[5] which consisted of all L'Daisy's business debts

14  that he was willing to assume.  Debtor explained that he thought

15  Cochrane, as Creditor's former or current boyfriend, represented

16  Debtor in the continued negotiations, although Debtor admitted that

17  Cochrane never stated that he was speaking for Creditor.  However,

18  Debtor testified that Cochrane advised him that Creditor was not

19  mentally available to finalize the transaction and therefore, in

20  addition to protecting Cochrane's own interests in the transaction,

21  Cochrane was going to assist with closing escrow on the

22  transaction.  Debtor testified that Cochrane was integral in

23  finalizing the contents of Exhibit A, which contained total debt of

24  $98,847.17 but did not include the three credit card debts.  With

25  regard to Griffin, Debtor explained that Griffin acted as the

26  escrow agent.  Cochrane did not testify at the evidentiary hearing.

27  _____

28       [5] Exhibit A was admitted into evidence as **Exhibit 6**.

MEMORANDUM DECISION SUSTAINING DEBTOR'S
OBJECTION TO CLAIM OF LAURA AUGUSTA                    8

Debtor confirmed that he did not discuss Exhibit A with Creditor.

Debtor was unable to recall why the three credit card debts were excluded from Exhibit A, but stated that other debts that were originally on the Vendor Balance Sheet were also not included in Exhibit A and explained that additional debts that were not originally on the Vendor Balance Sheet were included in Exhibit A. Debtor testified that he did not pay the three credit card debts because they were not included in Exhibit A and therefore he did not assume them.

Debtor explained that because he did not have any direct contact with Creditor after she left town in June 2001, he had the Escrow Documents finalized, which included Exhibit A, through an escrow company. Debtor asserted that Exhibit A was specifically identified in the Closing Statement[6] and referenced again in the Indemnity Agreement[7]. Debtor represented that at no time did Creditor advise him that she did not receive a copy of Exhibit A or that she wanted to discuss the business debt that he was assuming.

II.

POST-HEARING BRIEFS

During the evidentiary hearing Debtor asserted that, even if he were liable for the three credit card debts, more than four years had elapsed since the credit card charges at issue were incurred and therefore Creditor was no longer responsible for these debts because the statute of limitations had run; as such Debtor cannot

---

[6] The Closing Statement was admitted into Evidence as **Exhibit 3**.

[7] The Indemnity Agreement was admitted into evidence as **Exhibit 5**.

MEMORANDUM DECISION SUSTAINING DEBTOR'S
OBJECTION TO CLAIM OF LAURA AUGUSTA                    9

be held liable for the credit card debts. Upon completion of the evidentiary hearing, the Court, in its *Order Regarding Issue of Statute of Limitations*, requested that the parties submit post-hearing briefs related to Debtor's argument that an applicable statute of limitations eliminates Creditor's liability, if any, with regard to the three credit card debts and therefore Debtor should not have any obligation to pay these debts.

**A. Creditor's Post-Hearing Brief**

On or about January 20, 2006, Creditor filed *Creditor Laura Augusta's Response To Order Regarding Statute of Limitations* arguing that despite the running of the statute of limitations on the credit card companies' rights to enforce the charges against Creditor through a lawsuit, California law provides that Creditor is still obligated on the debts and Creditor will therefore continue to suffer harm to her credit because Debtor breached the Indemnity Agreement which obligated him to indemnify Creditor for loss and liability associated with L'Daisy's business debts.

Under California Code of Civil Procedure ("CCP") § 337, the statute of limitations to collect on Creditor's credit card debt is four years. Creditor asserted that Debtor's argument -- that if the statute of limitations had run, then Creditor would have no obligation to make any payments to the credit card companies thereby eliminating Debtor's duty to pay damages to Creditor -- is incorrect because California law does not exonerate Creditor from her obligations under her contracts with the credit card companies despite the running of the statute of limitations. Creditor asserted that the running of the statute of limitations merely makes the obligation unenforceable through the courts, but

Creditor analogized the current situation to the obligations of a surety and asserted that, notwithstanding the fact that the statute of limitations ran on the obligations of a principal, a surety's obligations remain intact and therefore Debtor remains obligated to Creditor for payment of the credit card debts. See Gaffingan v. Lawton, 1 Cal.2d 722 (1934).

Creditor also asserted that in addition to the monetary damages for the credit card debts, she suffered additional damages because Debtor, by failing to pay the balances on the credit cards, damaged her credit rating. According to Creditor, Debtor specifically agreed, in the Indemnity Agreement, to defend, indemnify and hold her harmless against any loss or liability arising from the obligations that Debtor assumed. Creditor asserted that the provision in the Indemnity Agreement is sufficiently broad to obligate Debtor to pay Creditor for any loss or liability arising out of the credit card debts. Creditor proposed that the Court conduct a further hearing so that she could establish the nature and extent of her damages.

**B.  Debtor's Post-Hearing Brief**

On or about February 6, 2006, Debtor filed his *Memorandum of Points and Authorities in Support of Objection to Claim of Laura Augusta* asserting that he is not liable for Creditor's credit card debt because he did not assume the debt and did not agree to indemnify Creditor for the debt. Specifically, Debtor noted that the Indemnity Agreement obligated Debtor to indemnify Creditor against loss and liability arising from only those debts

1 specifically identified in Exhibit A attached to the Indemnity

2 Agreement.  Since the credit card debts were not part of Exhibit A,

3 Debtor argued that he is not obligated to pay Creditor for these

4 debts.

5     Debtor explained that CCP § 337 provides for a four year

6 statute of limitations on collection of the type of debt currently

7 in dispute.  Debtor stated that the disputed debt is over four

8 years old and is therefore uncollectible.  Although Debtor did not

9 admit that he assumed the debt, Debtor asserted that even if he

10 had, Creditor failed to meet her burden of showing actual damages

11 because she admitted that she did not pay anything on two of the

12 credit card debts and paid $677.00 to settle the balance on the

13 third credit card.  Debtor assumed, because no evidence was

14 presented regarding the timing of the $677.00 payment, that

15 Creditor made the payment after the running of the statute of

16 limitations, which makes the payment voluntary, thereby stripping

17 her of any entitlement to indemnification because an obligation to

18 indemnify does not accrue if the law does not impose any obligation

19 on the indemnitee.  See United States Fidelity etc. Co. v. More,

20 155 Cal. 415, 418 (1909); Southern Cal. Gas Co. v. Ventura etc.

21 Co., 150 Cal.App.2d 253, 257 (1957).  Debtor argued that a

22 voluntary payment is not made on account of a legal obligation.

23     Debtor next asserted that if the other two credit card

24 companies sued Creditor to collect on the outstanding debt,

25 Creditor would have to raise the statute of limitations as a

26 defense or her right to indemnification would be waived.  Easton v.

27 Boston Investment Co., 51 Cal.App. 246, 250 (1921); See Cal. Civ.

28 Code § 2778(7).

MEMORANDUM DECISION SUSTAINING DEBTOR'S
OBJECTION TO CLAIM OF LAURA AUGUSTA     12

1    Debtor then explained that, pursuant to the Indemnity

2    Agreement, he is an indemnitor, as to the debts listed on Exhibit

3    A, and not a surety as Creditor implied in her post-hearing brief.

4    Debtor stated that the California Civil Code contains separate and

5    distinct definitions of an "indemnitor" and a "surety."

6    Specifically, a surety undertakes to protect his or her promisee

7    against loss or damage resulting from the failure of a third person

8    to carry out obligations owed to the promisee.  See Cal. Civ. Code

9    § 2787; Somers v. United States F.& G. Co., 191 Cal. 542, 547

10   (1923).  An indemnitor undertakes to protect the promisee against

11   liability to a third person or loss resulting from the liability.

12   See Cal. Civ. Code § 2772; Somers.  Therefore, as an indemnitor and

13   because the statute of limitations has run, Debtor argued that he

14   does not have any direct obligation to Creditor on the debts

15   currently in dispute.

16       Finally, Debtor asserted that Creditor was responsible for

17   mitigating her damages.  Sackett v. Spindler, 248 Cal.App.2d 220,

18   238-239 (1967).  According to Debtor, if he had assumed the

19   disputed credit card debt, Creditor could have avoided any damage

20   to her credit by simply paying the debt.  Since she did not pay the

21   debt, Debtor cannot be held responsible for any damage to

22   Creditor's credit rating.

23

24                              III.

25                            ANALYSIS

26       Pursuant to § 502(a), a proof of claim is deemed allowed unless

27   a party in interest objects to it.  Rule 3001(f) of the Federal

28   Rule of Bankruptcy Procedure, provides that, "[a] proof of claim

MEMORANDUM DECISION SUSTAINING DEBTOR'S           13
OBJECTION TO CLAIM OF LAURA AUGUSTA

executed and filed in accordance with these rules shall constitute
*prima facie* evidence of the validity and amount of the claim."
FRBP 3001(f). If there is an objection to a filed claim, the
objecting party "is then called upon to produce evidence and show
facts tending to defeat the claim by probative force equal to that
of the allegations of the proofs of claim themselves. But the
ultimate burden of persuasion is always on the claimant." <u>Wright</u>
<u>v. Holm</u>, 931 F.2d 620, 623 (9th Cir. 1991); <u>In re Pugh</u>, 157 B.R. 898
(9th Cir. BAP 1993).

In this case, Creditor filed her Claim asserting that Debtor
owed her $189,203.26 resulting from her sale and Debtor's purchase
of L'Daisy. Debtor objected to the Creditor's claim on the grounds
that: (1) he paid or settled a substantial portion of the debt that
Creditor was asserting was due and owing; (2) of the remaining
unpaid debt, Debtor asserted that the holders of those claims
obtained judgment liens against him and that, he and not Creditor,
is solely liable on those debts; and (3) he did not assume the debt
on Creditor's three credit cards. As provided above, the parties
stipulated that the purpose of the evidentiary hearing was to
determine Debtor's liability, if any, for the three credit card
debts with an aggregated balance, as of June 1, 2001, of
$11,228.94.

The evidence presented clearly established that the transaction
between the parties was unusual -- Creditor gave Debtor possession
of L'Daisy before the parties had any sort of written agreement;
Creditor admitted to suffering psychologically and therefore needed
to leave town; and after Creditor left town, the parties had no
further communications with each other.

MEMORANDUM DECISION SUSTAINING DEBTOR'S
OBJECTION TO CLAIM OF LAURA AUGUSTA

14

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1    This Court's analysis begins with the issue of when the parties

2    reached an agreement for the purchase and sale of L'Daisy.  The

3    parties dispute the timing of the agreement.  Creditor asserted

4    that immediately before leaving town, the parties had reached an

5    agreement for the sale and purchase of L'Daisy.  However, Debtor

6    asserted that when Creditor left town, the parties still had not

7    agreed on the debt that Debtor was going to assume.  The only

8    written evidence presented regarding the sale and purchase of

9    L'Daisy was the Escrow Documents.

10   Although Creditor testified that the Vendor Balance Sheet,

11   which she prepared with Debtor's bookkeeper, evidenced the debts

12   that Debtor agreed to assume, Creditor did not present any other

13   corroborating evidence supporting this agreement.  Debtor disputed

14   that an agreement was reached based on the Vendor Balance Sheet and

15   explained that the delay in closing the transaction, approximately

16   8 months, was because new debts continued to filter into the

17   business and he was having difficulty ascertaining the entirety of

18   L'Daisy's business debts.  Debtor pointed out that the debt

19   contained in the Vendor Balance Sheet was only $85,478.32, while

20   the total debt that he agreed to assume in the Escrow Documents was

21   $98,847.17 -- an increase of $13,368.85.  Neither Creditor nor

22   Debtor testified that the parties agreed that Debtor would assume

23   all the debts contained in the Vendor Balance Sheet plus any

24   additional debts that arose prior to the closing of the

25   transaction.  Instead, Debtor credibly explained that he was

26   identifying L'Daisy's business debts from the date Creditor left

27   town until the Escrow Documents were finalized.

28   Based on the evidence presented, this Court accepts the Escrow

MEMORANDUM DECISION SUSTAINING DEBTOR'S
OBJECTION TO CLAIM OF LAURA AUGUSTA                15

1  Documents as the accurate reflection of the agreement between the

2  parties. If the parties had reached an agreement in June 2001,

3  when Creditor left town, it is unlikely that Debtor would continue

4  to identify additional debts to assume and include in the Escrow

5  Documents. In addition, Creditor's own testimony that she found

6  the negotiations overwhelmingly stressful and caused her to leave

7  town, indicates that at the time of Creditor's departure, the

8  parties had not reached a final agreement. Creditor did not

9  testify that she left town after selling L'Daisy to Debtor.

10  The Court finds Creditor's testimony that Debtor initially

11  agreed to pay the subject credit card bills to be generally

12  credible, however, significant events transpired after Creditor

13  left town and essentially abandoned and abdicated her role in the

14  negotiations with Debtor.[8] After Creditor left town, Debtor was

15  left with only Cochrane and Griffith, two individuals that did not

16  have any real knowledge of the business, to assist with identifying

17  the debts that Debtor would assume. Ultimately, it was Creditor's

18  responsibility to accept or not accept the terms of the transaction

19  -- by closing or not closing the sale. Creditor had -- or

20  certainly could have obtained -- access to Exhibit A if she wished

21  to examine the debts that Debtor was assuming as part of the

22  purchase of L'Daisy. It was not reasonable for Creditor simply to

23  sign the Escrow Documents without first reviewing the content of

24  each and every document. The fact that Debtor assumed $98,847.17 -

25  - over $13,000 more than the original $85,478.32 figure contained

26  in the Vendor Balance Sheet -- convinces the Court that the Vendor

27

28    [8] The Court accepts Creditor's explanation that for personal and psychological/medical
    reasons, it was necessary for her to terminate all contact with Debtor and L'Daisy.

MEMORANDUM DECISION SUSTAINING DEBTOR'S
OBJECTION TO CLAIM OF LAURA AUGUSTA                16

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

Balance Sheet was not the parties' final agreement as to the specific debts that Debtor would assume.

Despite finding that the Escrow Documents represented the entirety of the agreement between the parties and that the Vendor Balance Sheet did not represent the final agreement as to debts Debtor would assume, the Court next considers Creditor's argument that the Vendor Balance Sheet, and not Exhibit A, is the actual attachment to the Indemnity Agreement and the Closing Statement.

Creditor testified that when she received the Escrow Documents, she did not receive Exhibit A and therefore did not agree to its contents. Creditor further testified that she did not contact either the escrow company or Debtor to obtain a copy of Exhibit A. Creditor explained that when she reviewed the Escrow Documents, she saw that an Exhibit A was referenced and noted that Debtor was assuming $98,847.17 in general business debt. Creditor testified that she assumed that the $98,847.17 represented the debts identified in the Vendor Balance Sheet plus additional business debts. Creditor explained that she signed the Escrow Documents based on her assumption.

Both parties testified that after Creditor left town they never communicated directly with each other. Debtor testified that he did his best to identify all of L'Daisy's business debts without Creditor's assistance. Debtor explained that he used an escrow company to finalize the transaction so that the escrow company would properly handle arranging for all the Escrow Documents to be approved and signed. Debtor asserted that Exhibit A was part of the Escrow Documents.

The Closing Statement and the Indemnity Agreement clearly

Case: 04-54151     Doc# 93     Filed: 05/26/06     Entered: 06/06/06 14:17:58     Page 17 of
20

1  reference Exhibit A.  Creditor admitted to seeing the references to
2  Exhibit A, but instead of contacting either the escrow agent or
3  Debtor to obtain a copy of Exhibit A, she simply signed the Escrow
4  Documents based on an inaccurate assumption.  "It is well
5  established, in the absence of fraud, overreaching or excusable
6  neglect, that one who signs an instrument may not avoid the impact
7  of its terms on the ground that he failed to read the instrument
8  before signing it." Randas v. YMCA of Metropolitan Los Angeles, 17
9  Cal.App.4th 158, 163 (1993), quoting Hulsey v. Elsinore Parachute
10 Center, 168 Cal.App.3d 333, 339 (1985); see also Madden v. Kaiser
11 Foundation Hospitals, 17 Cal.3d 699, 710 (1976); Izzi v. Mesquite
12 Country Club, 186 Cal.App.3d 1309, 1318-1319 (1986).  Creditor did
13 not assert fraud -- she did not assert that anyone told her that
14 Exhibit A was the Vendor Balance Sheet -- and she did not testify
15 that anyone prevented her from calling either the escrow agent or
16 Debtor to obtain a copy of Exhibit A.  The fact that Creditor
17 decided not to review Exhibit A does not cause Debtor to be liable
18 for debts that were not specifically identified in Exhibit A.
19 Although Creditor did not sign or initial Exhibit A, she signed the
20 balance of the Escrow Documents to finalize the transaction and
21 some of those documents referenced Exhibit A.

22     Based on the foregoing, the Court finds that Creditor failed to
23 meet her burden of proving that Debtor is liable for the three
24 credit card debts identified in the Claim.  Since Debtor is not
25 liable for the three credit card debts, the issue of whether the
26 applicable statute of limitations precludes Debtor's liability for
27 these debts is moot, because Debtor has no obligation to indemnify
28

1  Creditor for any debts not listed in Exhibit A.

2                                IV.

3                             CONCLUSION

4      For the reasons stated above Debtor's objection to Creditor's

5  Claim is sustained and such Claim is disallowed in its entirety.

6      Counsel for Debtor shall submit a form of order so providing,

7  after review by Creditor as to form.  The Order shall also include

8  the parties' stipulation that to the extent Creditor is legally

9  required to pay Cochrane or Midwest for the debts associated with

10 L'Daisy, Debtor must indemnify and reimburse Creditor per the terms

11 of the Indemnity Agreement.

12

13 Dated:

14

15 May 26, 2006

16

17                                    Arthur S. Weissbrodt

18                            ARTHUR S. WEISSBRODT
                              UNITED STATES BANKRUPTCY JUDGE

19

20

21

22

23

24

25

26

27

28

MEMORANDUM DECISION SUSTAINING DEBTOR'S
OBJECTION TO CLAIM OF LAURA AUGUSTA                19

Court Service List

Paul B. Burton
21731 Chona Court
San Jose, CA 95120

Judson Farley, Esq.
830 Bay Ave. #B
Capitola, CA 95010-2173

Alan J. Sternberg, Esq.
Law Offices of AlanJ.Sternberg
1646 N.California Blvd., Suite 550
Walnut Creek, CA 94596

Devin Derham-Burk
P.O. Box 50013
San Jose, CA 95150-0013

Office of the U.S. Trustee
U.S. Federal Bldg.
280 S 1st St. #268
San Jose, CA 95113-3004